**BATES INDUSTRIES, INC., Plaintiff,**

v.

**DAYTONA SPORTS CO. and Daytona
Products, Inc., Defendants,**

Paulson Manufacturing Corporation,
Intervenor.

Civ. A. No. 67–1490.

United States District Court,
C. D. California.

Aug. 14, 1969.

Fulwider, Patton, Rieber, Lee &
Utecht, Francis A. Utecht, J. F. Mc-
Lellan, Long Beach, Cal., for plaintiff.

Lyon & Lyon, Roland N. Smoot, Rob-
ert M. Taylor, Jr., Los Angeles, Cal., for
defendants and intervenor.

MEMORANDUM AND ORDER PAR-
TIALLY GRANTING MOTION
FOR SUMMARY JUDGMENT

PREGERSON, District Judge.

This is an action for patent infringe-
ment brought against defendants, Day-
tona Sports Co. and Daytona Products,
Inc. Paulson Manufacturing Co. was
permitted to intervene and be joined as
a defendant. Defendants and intervenor
filed this motion for summary judg-
ment. The matter came on for hearing
and was submitted to the Court for its
decision. Having read all the pleadings

and papers on file and having considered the oral arguments of counsel, the Court now makes the following findings of fact and conclusions of law.

This action arises out of the patent laws of the United States. Subject-matter jurisdiction is founded upon 28 U.S.C. § 1338(a).

On July 29, 1963, Walter R. Hiatt and Michael M. King filed in the United States Patent Office their applications for a utility patent and a design patent on their alleged invention entitled "Visor Helmet." The utility patent application was defective in form and was returned. It was filed again and received an effective filing date of August 30, 1963.

The design patent for "Helmet" was issued to plaintiff, the assignee of the inventors, on April 6, 1965, as United States Design Letters Patent No. D. 200,757 [hereinafter referred to as the design patent]. The utility patent for "Visor Helmet" was issued to plaintiff, the assignee of the inventors, on June 22, 1965, as United States Letters Patent No. 3,189,918 [hereinafter referred to as the '918 patent]. Plaintiff is, and at all relevant times has been the owner of said patents. A copy of the diagram included in said patents is attached hereto as Appendix A.

Defendants contend that the patents are invalid. They assert that the '918 patent was anticipated by, or was obvious from, an unpatented visor assembly commonly known and sold publicly more than one year prior to the application date of the '918 patent.[1] That prior art visor assembly was produced and sold by a California corporation named McHal Enterprises, Inc.[2] Defendants also contend that the design patent is invalid because its allegedly distinctive features are functional in nature.

### '918 PATENT

The '918 patent claims a combination consisting of three elements: (1) a standard crash helmet with three male snap fasteners rigidly mounted on the forehead portion, said helmet being old in the art,[3] (2) an adapter band using snap fasteners on the helmet, the adapter band continuing around to the sides of the helmet with snap fasteners located on its ends, to which the shield is pivotally attached, and (3) a transparent plastic shield which is pivotally mounted to the adapter band so that it can be rotated up and away from the wearer's face, but is ordinarily held in place by a stop means so that it substantially covers and protects the face of the wearer.[4]

1. Defendants' Memorandum of Points and Authorities, filed April 25, 1969, at pp. 24–26.

2. *Ibid.* Plaintiff does not controvert the prior sales of the McHal assembly. This fact is therefore assumed to be true. F.R.Civ.P. 56(e).

3. Plaintiff stated in the '918 patent Specifications that the helmet was old in the art. See Defendants' Exhibit 1, Column 1, lines 12–26.

4. The claims of the '918 patent read as follows.
We claim:
1. A visor helmet assembly, comprising;
(a) a helmet having a plurality of projecting fastener elements on the forehead portion thereof;
(b) an elongated, flexible, curved strip adapter band which extends across the forehead portion of said helmet and around the sides thereof;
(c) said adapter band having a plurality of lateral slots and cooperating fastener elements slidably mounted in said slots and into which said projecting fastener elements are detachably mounted, said lateral slots making it possible for the adapter band to fit different helmets where the spacing of said projecting fastener elements may vary:
(d) additional fastener elements mounted to the extremities of said band;
(e) a curved elongated visor which extends to the sides of said helmet and has an extent sufficient to substantially cover the face of the wearer of said helmet;
(f) said visor having a plurality of complementary fastener elements adjacent the upper edges of its side margins which detachably and pivotally engage said additional fastener elements; and
(g) stop means on said adapter band

The snap fasteners on the adapter band are not rigidly mounted; two of the three snap fasteners that mount the assembly to the helmet can slide a small distance along the length of the band. This permits the adapter band to be attached easily to helmets of various sizes and shapes, wherein the distance between the three standard snap fasteners may vary to a small extent. The stop means used to lock the shield in place consists of a male element of a snap fastener which locks into a corresponding hole on the visor or shield.

In their application for what became the '918 patent, the patentees listed the following objects of their invention, which they represented to be improvements over the prior art: (1) to substitute, for the peaked sun visor that gave only partial protection, a transparent shield that substantially covers and protects the wearer's entire face, (2) to pivotally attach the transparent shield to the helmet so that it could be flipped up and out of the way of the wearer's face when not in use, (3) to attach the assembly to the standard crash helmet in such a way that it could be mounted and dismounted easily, (4) to provide a flip-up shield assembly that is simple and inexpensive.[5]

After their initial application had been denied, the patentees emphasized in their remarks to the Patent Examiner that the feature of their invention which made it particularly distinctive over the prior art was the mounting of the snap fasteners into longitudinal slots on the adapter band, which permitted the spacing of the snap fasteners to vary so that the assembly might be interchangeably mounted to different helmets.[6]

The operation and construction of the McHal assembly is almost identical to the '918 patent. A graphic comparison of the McHal assembly and the '918 patent is included herein as Appendix B.[7] The McHal assembly consists of: (1) a standard crash helmet with three male snap fasteners rigidly mounted on the forehead portion, (2) a brimmed or peaked visor with snap fasteners designed to mate with the snap fasteners on the helmet, the visor continuing around to the sides of the helmet with fasteners located on its ends, to which the shield is pivotally attached, and (3) a transparent plastic shield which is pivotally mounted to the peaked visor so that it can be rotated up and away from the wearer's face but is ordinarily held in place by a stop means to substantially cover and protect the face of the wearer.

The peaked visor in the McHal assembly attaches to the standard crash helmet in precisely the same way as the '918 patent adaptor band attaches to the standard crash helmet: snap fasteners are mounted into longitudinal slots on

---

which is engageable with said visor to hold it in position over the face of the wearer of said helmet.
2. The visor helmet as set forth in claim 1, wherein
(a) there are three of said projecting fastener elements on said helmet, one of said projecting fastener elements being located at the center of said forehead portion of said helmet; and
(b) said adapter band includes a central cooperating snap fastener element fixedly secured thereto and into which said one center projecting fastener of the helmet is detachably received, said cooperating fastener elements in said lateral slots on said adapter band detachably receiving the other projecting fastener elements on said helmet

3. The visor helmet assembly as set forth in claim 1, wherein
(a) said stop means is a central projecting stop element; and
(b) said visor has an opening adjacent the top edge thereof adapted to receive said projecting stop element to thereby hold said visor in position over the face of the wearer of the helmet.

5. See File Wrapper for United States Patent No. 3,189,918, Defendants' Exhibit 15, at pp. 3–4.

6. *Id.*, at pp. 32–33.

7. Appendix B was prepared and submitted by Defendants as their Exhibit 19.

the peaked visor, permitting the spacing of the snap fasteners to vary so that the assembly might be interchangeably attached to different helmets.[8] The peaked visor in the McHal assembly also continues around to the sides of the helmet, with fasteners on the ends to mount the flip-up transparent shield, as in the '918 patent.[9] The stop means used in the McHal assembly is somewhat different from that of the '918 patent; it consists of a rubber-covered metal strip rolled over onto itself to form a nodule, which is attached to the shield and engages the edge of the peaked visor to hold the shield in position over the wearer's face.[10]

Thus the McHal assembly, which was not cited by the Patent Examiner in the '918 patent, accomplishes all of the objectives that the patentees listed in the '918 patent application. Moreover, it utilizes the same variably spaced mounting of the snap fasteners which the patentees asserted made the '918 patent distinctive over the prior art. Defendants therefore contend that the peaked visor in the McHal assembly anticipated the adapter band in the '918 patent.[11]

In opposition to this motion for summary judgment, plaintiff contends that the peaked visor of the McHal assembly is substantially different from the adapter band of the '918 patent because the peaked visor positions the transparent shield away from the wearer's face whereas the adapter band permits the transparent shield to be positioned close to the wearer's face. Plaintiff asserts that the significant feature of the '918 patent is that it eliminates the need for the peaked visor and provides a helmet-shield assembly that is more suitable for use by a motorcyclist than the McHal assembly.[12]

Eliminating the peaked visor and positioning the shield closer to the wearer's face allegedly reduces the torque on the wearer's head caused by the wind hitting the projecting shield from the side. Reducing the torque reduces the difficulty which a motorcyclist might encounter in turning his head from side to side. In addition, reducing the projection of the shield outwardly from the motorcyclist's face allegedly makes it easier for a motorcyclist to breathe, because it may reduce air turbulance be-

8. Plaintiff admits that this method of mounting snap fasteners to the adapter band was used in the prior art. Response of Plaintiff to Request for Admission of Facts and Genuineness of Documents, filed August 13, 1968, p. 6.

9. The McHal assembly also utilizes a leather strap which extends fully around the exterior of the helmet and is buckled together in the back. This strap serves as an added safeguard to prevent the visor and shield from coming off the helmet accidentally. Its use is not required, however. See, Welsh Deposition, filed December 20, 1968, p. 29.

10. One reason why the stop means used on the McHal assembly is different from that used in the '918 patent may be due to the different applications for which the two assemblies were designed. The McHal assembly was originally designed to be used in conjunction with goggles, as an added protection. The wearer would position the shield over his face and over his goggles. If the shield became dirty or damaged during the course of an automobile race, the wearer could then flip-up the shield and still be protected by his goggles, which would be clean and undamaged. See Affidavit of Merlin H. Wyckoff, filed May 20, 1969.
In contrast, the '918 patent shield is ordinarily not to be flipped up during the course of a race. See *supra*, note 3, at Column 1, lines 57–61. The stop means used in the '918 patent therefore holds the shield more securely and makes it more difficult to flip-up the shield.

11. Defendants' Brief in Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment, filed May 21, 1969, p. 2.

12. Plaintiff's Opposition to Defendants' Motion for Summary Judgment, filed May 20, 1969, pp. 20–22.

tween the shield and the wearer's face.[13]

These alleged advantages of eliminating the peaked visor in a flip-up shield assembly were not asserted by the patentees in seeking the '918 patent. However, even if the patentees had raised these advantages over the McHal assembly, they should not have been entitled to a patent.

Eliminating the peaked visor may have minimized the problems of torque and turbulence, but it was not a new idea. As early as July 1962 there were published advertisements for transparent shields attached to crash helmets without the peaked visor, as in the '918 patent.[14]

Therefore the '918 patent assembly is simply a combination of old elements consisting of the standard crash helmet, the McHal assembly with the peak removed, and the transparent shield positioned close to the face, as previously used with peakless helmets. It was not a new idea to slidably mount the snap fasteners on the adapter band so that the adapter band could easily be used with different helmets in which the spacing of the snap fasteners might vary, because this precise method was taught by the McHal assembly. It was not a new idea to extend the adapter band to the sides of the helmet and to place fasteners on the ends of the band in order to pivotally mount a transparent shield, because this was clearly taught by the McHal assembly. It was not a new idea to use a stop means to hold the flip-up shield in place over the wearer's face, because this was also taught by the McHal assembly. It was not a new idea to eliminate the peak in order to position the transparent shield close to the wearer's face, because this was disclosed in prior publications.[15]

■■ A mere combination of old elements which does not accomplish a new result does not constitute a patentable invention. Hutchinson v. Pacific Car & Foundry Co., 319 F.2d 756 (9th Cir. 1963). Eliminating or omitting the sun-visor peak in the McHal assembly but retaining the adaptable mounting features of the McHal visor is not inventive. Grayson Heat Control, Ltd. v. Los Angeles Gas Appliance Co., Inc., 134 F.2d 478 (9th Cir. 1943). Nor is a change in the form of the McHal visor in order to position the flip-up shield closer to the wearer's face a patentable invention. Pullman Incorporated v. ACF Industries Incorporated, 393 F.2d 83 (2d Cir. 1968).

■ The Court therefore finds that there is no genuine issue as to any fact material to the validity of Claims 1 and 2 of the '918 patent. The Court further

---

13. Marlin H. Wyckoff, the person who originally suggested to McHal that they make a shield attachment, which resulted in the development of the McHal assembly discussed herein, states in his affidavit that the McHal assembly was designed for the racing car driver rather than for the motorcyclist. The racing car driver has a windshield on his car, which reduces problems of wind torque and turbulence. Wyckoff affidavit, *supra*, note 10.

14. Affidavit of Charles Edward Deane, filed May 21, 1969.

15. Plaintiff relies on the depositions of Victor Paulson and Frederick F. Welsh to show that the '918 patent was not obvious from the prior art because others had tried to develop similar structures and had failed. Opposition, *supra*, note 12, pp. 9–26. But a careful examination of the Paulson statement indicates that Paulson's efforts failed because he did not make his structure dimensionally suitable for some Japanese helmets introduced into the market and because he tried to make his adapter band out of plastic rather than metal, for safety reasons. See Opposition, *supra*, note 12, pp. 11–13; Brief in Reply, *supra*, note 11, at p. 5. Welsh, who is President of McHal, was not certain of the extent or nature of McHal's attempts to design a flip-up shield assembly without a peaked visor. Welsh's testimony does not show that McHal made a serious effort to develop this kind of assembly. Welsh Deposition, *supra*, note 9, pp. 54–58.

finds that, based on the facts as to which there is no genuine issue, Claims 1 and 2 of the '918 patent are invalid, because the structure claimed is not inventive over the prior art.[16]

■ Defendants have not adequately placed the validity of Claim 3 in issue in their presentation on this motion for summary judgment. Defendants contend that the '918 patent stop means is a mere transposition of elements.[17] The difference between the stop means used in the McHal assembly and the stop means used in the '918 patent seems to be more than a mere transposition of elements, however. Therefore, the Court finds that there are genuine issues as to facts material to the validity of Claim 3 of the '918 patent.

## THE DESIGN PATENT

■ In support of the design patent, the patentees asserted to the patent examiner that their design is distinctive in appearance and attractive to the motorcycle enthusiast because it provides a trim silhouette as a result of the elimination of the peak and the blending of the transparent shield with the helmet line. They also stated that the shield does not extend much below the chin of the wearer, that the lower edge of the shield tapers back in an upwardly extending angular line which gives a trim, compact, and "racey" appearance to the helmet assembly.[18] Plaintiff here adopts the same position.

Assuming that plaintiff is correct in asserting that its helmet assembly is aesthetically more pleasing and ornamental in appearance than the prior art cited in the design patent, it is nevertheless true that the two patents cited by the Patent Examiner which involved the use of a face shield were designed for use in industrial applications, where a trim, compact, and "racey" appearance would not be very important.[19] The Patent Examiner did not consider helmet-shield designs for sport applications, such as the McHal assembly.

The McHal assembly utilizes a peak, and is different from the trim, straight-line appearance achieved by plaintiff's assembly, wherein the protuding peak is eliminated. But the McHal assembly includes a transparent face shield that does not extend much below the chin of the wearer and the lower edge of the McHal assembly tapers back in an upwardly extending curved line, giving somewhat the same effect as that of plaintiff's assembly.[20] The difference in appearance between the McHal assembly and the patent-in-suit is primarily attributable to the fact that the protruding peak found in McHal is eliminated in the design patent. But it was not new or original to eliminate the peaked visor in a helmet-shield combination. Transparent face shields for use with helmets without peaked visors existed in the prior art more than one year before the patentees filed their design patent application.[21] The trim, compact, and "racey" appearance achieved by eliminating the peak was therefore old in the art. Prior art such as the McHal assembly or peakless helmet-shield combinations were not cited by the Patent Examiner as references, however. The design patent is therefore invalid because it was not new and original.[22]

---

16. 35 U.S.C. § 103.

17. *Supra*, note 1, at p. 27.

18. File Wrapper of United States Design Patent No. D.200,757, Defendants' Exhibit 16, pp. 8, 13–14.

19. *i.e.*, Anderson, United States Patent No. 2,410,256; Summers, United States Patent No. 2,688,962. *Id.* at p. 5. These patents are shown as Defendants' Exhibits 9 and 10.

20. See Appendix B.

21. *Supra*, note 14.

22. 35 U.S.C. § 171.

The design patent is also invalid, moreover, because its dominant features primarily serve a functional and utilitarian purpose.[23] Although the patentees did not disclose this in their application for the design patent, the plaintiff asserts in this summary judgment proceeding that the elimination of the peak and the positioning of the transparent shield close to the wearer's face, in line with the lines of the helmet, is necessary in order to reduce problems of wind torque and wind turbulence. *Supra.* The elimination of the peak was therefore functional rather than a matter of aesthetics. In addition, the shape of the transparent shield is a result of functional requirements. The patentee, Walter R. Hiatt, admitted that the lower edge of the transparent shield must taper back rather than being squared off so that the shield does not hit the shoulder of the wearer when he turns his head.[24] Thus it appears that all of the features on which the plaintiff relies are functional in nature and designed to adapt the flip-up shield assembly specifically for sport applications such as motorcycle racing.

The Court therefore finds that there is no genuine issue as to any fact material to the validity of the design patent. The Court further finds that, based on the facts as to which there is no genuine issue, the design patent is invalid, because it was not new and original and because its allegedly distinctive features serve primarily functional requirements.

## CLAIM FOR ATTORNEY FEES

■ Defendants also contend that the patentees exercised bad faith in failing to bring the McHal assembly to the attention of the Patent Examiner. Defendants further contend that plaintiff has no reasonable basis for asserting the validity of its patents and that plaintiff has brought and maintained this action in bad faith. Defendants therefore seek reasonable attorney fees.

The material presented by defendants does not show that the patentees intentionally withheld information from the Patent Examiner.[25] Nor does it appear that plaintiff exercised bad faith in bringing and maintaining this action.[26]

It is ordered that this Motion for Summary Judgment is partially granted, in accordance with F.R.Civ.P. 56(d), and that Claims 1 and 2 of United States Patent No. 3,189,918 are declared invalid.

It is further ordered that the Motion for Summary Judgment is denied as to Claim 3 of the aforesaid patent.

It is further ordered that United States Design Patent No. D. 200,757 is declared invalid.

It is further ordered that the Motion for the awarding of reasonable attorney fees is denied.

---

23. Barofsky v. General Electric Corp., 396 F.2d 340 (9th Cir. 1968).

24. Defendants' Exhibit 13, pp. 10–11. This same functional requirement would also mean that the shield should not extend much below the chin of the wearer.

25. Mr. Hiatt, the patentee, stated that he saw the McHal assembly prior to the filing of his application for the '918 patent. *Id.* at p. 30. But this is insufficient to show that Hiatt intentionally failed to disclose the existence of the McHal assembly to the Patent Examiner. Defendants have not shown misstatements of facts and "calculated recklessness about the truth," which formed the basis for the awarding of attorney's fees in the case of Monolith Portland Midwest Cement Co. v. Kaiser Aluminum & Chemical Corp., 407 F.2d 288, 297 (9th Cir. 1969).

26. Although this Court finds that the '918 patent is obvious from the McHal assembly and the prior art shields used with peakless helmets, it does not appear that plaintiff's arguments to the contrary were made in bad faith and without any basis whatsoever. See, *e. g.,* Wyckoff affidavit, *supra,* note 10.

318

FIG. 1

FIG. 4

FIG. 3

FIG. 2

FIG. 5

INVENTOR.
WALTER R. HIATT
MICHAEL M. KING
BY FULWIDER, PATTON,
RIEBER, LEE & UTECHT

ATTORNEYS

APPENDIX A

[A1100]

HIATT ET AL PATENT NO. 3,189,918

PRIOR ART McHAL STRUCTURE

1. A visor helmet assembly, comprising:

(a) a helmet having a plurality of projecting fastener elements on the forehead portion thereof;

(b) an elongated, flexible, curved strip adapter band which extends across the forehead portion of said helmet and around the sides thereof;

(c) said adapter band having a plurality of laterals slots and cooperating fastener elements slidably mounted in said slots and into which said projecting fastener elements are detachably mounted, said lateral slots making it possible for the adapter band to fit different helmets where the spacing of said projecting fastener elements may vary;

(d) additional fastener elements mounted to the extremities of said band;

(e) a curved elongated visor which extends to the sides of said helmet and has an extent sufficient to substantially cover the face of the wearer of said helmet;

(f) said visor having a plurality of complementary fastener elements adjacent the upper edges of its side margins which detachably and pivotally engage said additional fastener elements; and

(g) stop means on said adapter band which is engageable with said visor to hold it in position over the face of the wearer of said helmet.

APPENDIX B

[A10873]